## A09A2022. TKW PARTNERS, LLC et al. v. ARCHER CAPITAL FUND, L.P.
## A09A2023. CROSSING PARK PROPERTIES, LLC et al. v. ARCHER CAPITAL FUND, L.P.
### (691 SE2d 300)

Doyle, Judge.

These appeals arise from the trial court's order approving Archer Capital Fund, L.P.'s application for confirmation of sale under power of eight penthouse units of the 1280 West Condominium in Atlanta (the "Property"). In Case No. A09A2023, Crossing Park Properties, LLC, Joan F. Hammer, and Glen H. Hammer (the "CPP Defendants") contend that the trial court erred in confirming the sale because (i) Archer's notice was deficient as a matter of law, and (ii) Archer failed to establish that it sold the Property for true market value. In Case No. A09A2022, TKW Partners, LLC, 2000 Ocean Drive, LLC, William J. Schmitt, Thomas E. Schmitt, Barbara E. Schmitt, Kenneth F. Harris, Jr., Gayle Harris, and Condominium Ventures of America, Inc. (the "TKW Defendants"), contend that the trial court erred in accepting evidence of the "as-is" value of the Property as its true market value.

"The trial court is the trier of fact in a confirmation proceeding, and an appellate court will not disturb its findings if there is any evidence to support them."[1]

We are not, however, bound by the trial court's conclusions of law, which are subject to de novo review.[2]

The record shows that in 2006 Archer agreed to lend $11 million to 2000 Ocean Drive, Crossing Park, TKW, and Joan Hammer.[3] As partial security for the loan, Hammer and TKW executed and delivered two deeds to secure debt on the Property to Archer. TKW

---

[1] *Nash v. Compass Bank*, 296 Ga. App. 874, 875 (676 SE2d 28) (2009).

[2] See *Gooch v. Tudor*, 296 Ga. App. 414 (674 SE2d 331) (2009).

[3] Security for the loan included a guaranty executed by CPP Defendant Glen Hammer and TKW Defendants William Schmitt, Thomas Schmitt, Barbara Schmitt, Kenneth Harris, Jr., Gayle Harris, and Condominium Ventures.

transferred its interest in the Property to Hammer in March 2007.

On December 3, 2007, and April 29, 2008, Archer notified Crossing Park, TKW, and Hammer that the loan had not been paid when due. On May 16, 2008, and on July 1, 2008, Archer transmitted to Hammer a "Notice Pursuant to OCGA § 44-14-162.2" notifying her of its intent to foreclose on the Property. On August 5, 2008, pursuant to the power of sale in the deeds to secure debt, Archer conducted a nonjudicial foreclosure sale at which its subsidiary purchased the Property for $1,200,000. Archer then filed an application with the superior court for confirmation of the sale. Following a hearing, the trial court confirmed the sale.

## Case No. A09A2023

1. The CPP Defendants claim that the trial court erred in confirming the sale because Archer's notice was deficient as a matter of law. We disagree.

"Pursuant to OCGA § 44-14-161 (c), the trial court is required not only to determine whether the property sold brought its true market value but also to 'pass upon the legality of the notice, advertisement, and regularity of the sale.' "[4] Thus, a trial court should not confirm a sale under power if there is no evidence that the debtor, within the meaning of OCGA § 44-14-162.1, was properly notified of the sale in accordance with the statutory requirements.[5] We have also found, however, that "the duty of the court is to test the fairness of the technical procedure of the actual sale and to insure that the sale has brought at least the true market value of the property."[6] A court should not confirm the sale if it "is irregular . . . or if either the notice or the advertisement does not substantially meet legal requirements . . . [b]ut not every irregularity or deficiency at this point will void the sale."[7] In this case, the trial court concluded that Archer was required to notify Hammer of the sale, and that Archer gave timely notice in the manner and form prescribed by OCGA § 44-14-162.2.

We agree with the CPP Defendants that Archer was required to notify Hammer of the sale under the provisions of OCGA § 44-14-162.2. Under OCGA § 44-14-162.1, a "debtor" for purposes of

---

[4] *Martin v. Fed. Land Bank &c.*, 173 Ga. App. 142 (325 SE2d 787) (1984); OCGA § 44-14-161 (c).

[5] Id.; *Pope v. Trust Co. Bank of Coffee County*, 186 Ga. App. 23 (366 SE2d 373) (1988) (For purposes of confirmation, "[a]lthough not every irregularity or deficiency will void the sale, if either the notice or the advertisement does not substantially meet legal requirements, the sale should be set aside.").

[6] *Jones v. Hamilton Mtg. Corp.*, 140 Ga. App. 490, 491 (231 SE2d 491) (1976).

[7] *Shantha v. West Ga. Nat. Bank*, 145 Ga. App. 712 (244 SE2d 643) (1978).

OCGA § 44-14-162.2 includes the grantor of the security deed.[8] Although Hammer was not residing in the Property at the time she executed the security deed, the notice requirement applies "to the exercise of a power of sale of property all or part of which *is to be used* as a dwelling place by the debtor *at the time the mortgage, security deed, or lien contract is entered into.*"[9] The Property is residential in character, and the evidence shows that at the time Hammer signed the deed to secure debt she intended to reside in the Property. Although Hammer did not complete the planned renovations to the Property before the default on the loan and the subsequent foreclosure sale and thus was unable to carry out her intent to reside in the Property, the notice requirement is not contingent on whether the debtor dwells in the property after entering into the security deed.[10] Here, at the relevant time — the execution of the security deed — the Property was "to be used" as a dwelling by Hammer.

We disagree, however, with the CPP Defendants that Archer's notice failed to comply with the requirements of OCGA § 44-14-162.2. As applicable here, OCGA § 44-14-162.2 (a) required, among other things, that the notice "include the name, address, and telephone number of the individual or entity who shall have full authority to negotiate, amend, and modify all terms of the mortgage with the debtor."[11] Here, Archer's notice included the name, address, and telephone number of Archer's attorney, Tracy S. Plott. The notice did not state that Plott or any other person or entity had "full authority to negotiate, amend, and modify all terms of the mortgage."

According to Plott's testimony, she represented Archer and had as much authority as any individual to negotiate a loan modification on Archer's behalf, but that there was no individual at Archer with full authority to modify the loan because "it would be a group decision . . . there's not a magic name . . . there's not one individual." The CPP Defendants argue that because Plott's testimony shows that she did not have full authority to negotiate, amend, and modify the loan, Archer's notice failed to comply with OCGA § 44-14-162.2.

---

[8] The debtor also includes the current owner of the Property "[i]n the event the property encumbered by the mortgage, security deed, or lien contract has been transferred or conveyed by the original debtor" if the identity of the current owner is made known to and acknowledged by the secured creditor. OCGA § 44-14-162.1. Archer does not contend that Hammer was not a "debtor" as to the Property units conveyed to her by TKW.

[9] (Emphasis supplied.) OCGA § 44-14-162.3 (a).

[10] The deed to secure debt also provided that the secured property was not being used as a dwelling place and "the notice requirements of OCGA § 44-14-162.2 shall not be applicable" to exercise of the power of sale. This provision was ineffective in light of OCGA § 44-14-162.3 (b), which provides, in relevant part: "No waiver or release of the notice requirement of Code Section 44-14-162.2 shall be valid when made in or contemporaneously with the security instrument containing the power of nonjudicial foreclosure sale[.]"

[11] This language became effective May 13, 2008. Ga. L. 2008, p. 624, § 2.

They also contend that the notice's failure to expressly identify any entity or individual as having such full authority rendered the notice ineffective.

OCGA § 44-14-162.2 does not require the individual or entity be expressly identified as having "full authority to negotiate, amend, and modify all terms of the mortgage," and we cannot conclude that Archer's notice was legally deficient for failure to do so. Although Plott lacked plenary authority to modify the loan, the statute contemplates that the notice may provide contact information for the "entity" with full modification authority.[12] The notice identifies Archer as the lender, and the trial court found that "a person of reasonable intelligence would have construed that Ms. Plott was the proper agent for [Archer] in this case." Thus, Hammer and her attorney, who was also notified, were apprised of the appropriate contact information for Archer if Hammer wished to pursue a modification of the security deed. We find that the notice substantially complied with the requirements of OCGA § 44-14-162.2, and the trial court did not err in finding the notice legally sufficient for purposes of confirming the sale.

2. The CPP Defendants also claim that the trial court erred in confirming the sale because Archer failed to establish that it sold the Property for its true market value. We disagree.

OCGA § 44-14-161 (b) requires that the trial court "not confirm the sale unless it is satisfied that the property so sold brought its true market value" in the foreclosure sale. "[M]arket value is the price which the property will bring when it is offered for sale by one who desires, but is not obliged, to sell it, and is bought by one who wishes to buy, but is not under a necessity to do so."[13]

(a) At the time of the foreclosure sale, Hammer had converted the eight units described in the deeds to secure debt to a shell intended to be built out as a single residential unit. The renovations which had been completed, on which Hammer spent approximately $1 million, included removal of the interior partition walls, the removal of several nonload-bearing columns, and modifications to the HVAC, plumbing, and electrical systems. Norbert Shulz, Archer's appraiser, valued the Property in its "as-is" condition. He testified that the value of the Property as of July 2008 was $1.2 million.

Gary L. Bernes, who appraised the Property for the CPP Defendants, agreed with Shulz that the "one unit shell value" of the

---

[12] See OCGA § 44-14-162.2 (a).

[13] (Citation, punctuation and emphasis omitted.) *Wheeler v. Coastal Bank*, 182 Ga. App. 112, 114 (1) (354 SE2d 694) (1987).

Property was $1.2 million. Bernes also testified, however, that the "highest and best use" of the Property was to divide it into four units, each worth $475,000, and that the Property's market value was $1.9 million. After hearing the evidence, the trial court found that the true market value of the Property on the date of the foreclosure sale was $1.2 million. The court rejected a valuation based on the Property's highest and best use, indicating that such valuation assumed substantial additional investment in the Property and was "speculative as to . . . what the market would have borne at that time."

The CPP Defendants contend that an appraiser is required to determine market value based on a property's highest and best use. Therefore, they argue, a value opinion which is not based on a property's highest and best use cannot be a market value opinion, and the trial court erred in crediting Shulz's opinion and in finding that "highest and best use" was not the proper measure of value. We disagree.

We have not previously held that true market value for purposes of OCGA § 44-14-161 must be based on property's "highest and best use," and we decline to do so here. A trial court, in its discretion as the trier of fact, might find such use relevant[14] to "the price which the property will bring when it is offered for sale by one who desires, but is not obliged, to sell it, and is bought by one who wishes to buy, but is not under a necessity to do so."[15] Conversely, such use might not reasonably affect a property's true market value, as in some circumstances " '[h]ighest and best use' is . . . a much more speculative assigned value than existing use."[16] But we can find nothing in OCGA § 44-14-161 or prior case law which would *require* a trial court in every instance to adopt the highest and best use as the basis for determining true market value and to reject any appraisal which was not explicitly based on the property's highest and best use. "The statute does not preclude any specific method of property appraisal."[17]

Turning to the evidence in this case, both appraisers testified that they subscribed to Standard 1-3 of the Uniform Standard of

---

[14] By analogy, we have found that "where appropriate, assessors may consider the 'highest and best use' of real property under [OCGA § 48-5-2 (3) (B) (vi)] when assessing the 'fair market value.' " *Sibley v. Cobb County Bd. of Tax Assessors*, 171 Ga. App. 65, 67 (1) (318 SE2d 643) (1984).

[15] (Punctuation and emphasis omitted.) *Wheeler*, 182 Ga. App. at 114 (1).

[16] *Dotson v. Henry County Bd. of Tax Assessors*, 155 Ga. App. 557, 559 (271 SE2d 691) (1980) (finding that "[t]he court erred . . . in approving a valuation which tilted market value in favor of an assumed 'highest and best use' to appear from future speculation and development").

[17] *Trefren v. Freedom Bank of Ga.*, 300 Ga. App. 112, 115 (2) (684 SE2d 144) (2009).

Professional Appraisal Practice, which requires that an appraiser develop an opinion of the highest and best use "when necessary for credible assignment results in developing a market value opinion." However, we cannot conclude from the language of Standard 1-3 that applicable appraising standards require an appraiser's determination of market value to be based on the property's highest and best use in every instance. Furthermore, Shulz testified that his appraisal contemplated that the Property's highest and best use "at some future date" would be to be broken into multiple units, but that he decided to appraise the Property in its one-unit, "as-is" state, in light of its current physical condition, which included the considerable sums already spent on a one-unit conversion, as well as the depressed state of the market. Accordingly, Shulz did develop a highest and best use opinion but made a considered decision not to apply that use in valuing the Property. Under the evidence presented, the trial court was not required to disregard Shulz's valuation opinion merely because it was based on the existing one-unit configuration of the Property.[18]

Nor do we conclude that Bernes's application of the Property's highest and best use required the trial court to accept Bernes's opinion over that of Shulz.[19]

> On appellate review, the test is not whether this court would have accepted appellant's expert appraisals as the most reliable and accurate, but whether the record contains any evidence to support the findings of the trial court that the property brought its true market value at the foreclosure sale.[20]

It is apparent from the trial court's ruling that it considered the evidence and rejected a valuation based on Bernes's opinion of the Property's highest and best use in light of facts specific to the case.

(b) The CPP Defendants contend that the trial court erred in

---

[18] Nor do we find that Shulz's opinion was improper or incompetent because he based his appraisal on the Property "as-is." In their appellate brief, the TKW Defendants contend that an "as-is" appraisal yields a value akin to a "quick-sale" and is therefore artificially low and inconsistent with true market value. But both appraisers based their opinion on the "as-is" condition of the Property, and the TKW Defendants show no authority for the proposition that an appraisal cannot be based on this approach. According to Bernes, the difference in his appraisal was that, even given the as-is shell condition of the Property, its highest and best use would affect the market price.

[19] Bernes's testimony inferred that the Property would be more valuable if marketed as separate units. The trial court was nevertheless authorized to analyze the Property's true market value "as 'a single investment opportunity' rather than by adding together the true market values of each of the" units. (Punctuation omitted.) *Marett Properties v. Centerbank Mtg. Co.*, 204 Ga. App. 265, 266-267 (419 SE2d 113) (1992).

[20] (Punctuation omitted.) Id. at 267.

confirming the foreclosure sale because Shulz failed to identify and analyze a comparable sale, specifically a sale on May 1, 2008, of Unit 3908 in the 1280 West Condominiums, which was a 39th floor penthouse unit in the same building as the Property. According to Shulz's testimony, this sale was so recent that it may not have been posted on the data services he employed in researching the appraisal and there remained a number of unanswered questions relevant to its effect on his opinion testimony, including whether the sale was an open-market transaction. The trial court could have considered the failure to identify and analyze this sale in evaluating the credibility of Shulz's valuation testimony.[21] Nevertheless, the evidence does not show that Shulz's opinion would have differed had he known of the transaction. Furthermore, both appraisers agreed on the "one unit" value of the Property. In light of the "any evidence" standard of review, we cannot conclude that Shulz's failure to identify an allegedly comparable sale requires that the trial court's confirmation order be reversed.

(c) The CPP Defendants further argue that Shulz's opinion was based on "sheer speculation." We disagree.

As a rule, if an appraisal expert's "opinion was not based on sheer speculation, an appellate court cannot second guess any methodology utilized to reach the opinion."[22] Shulz's appraisal employed a discount for "entrepreneurial profit" in evaluating comparable sales. The discount was to entice a buyer "to go to all the trouble to build [the Property] out . . . as opposed to going next door and buying a penthouse that's . . . ready to go." The CPP Defendants contend that there is no evidence of the method Shulz used to calculate "entrepreneurial profit" and that, in any case, the Property could be purchased by an end-user who would not be interested in making a profit. Shulz explained, however, that the comparable sales were finished products, and that, as to those sales, there was profit from when "the investor built the building" included in the sale regardless of whether they were purchased by "people who just want to live there." The amount of the discount, according to Shulz, was vested in his judgment. The written appraisal supplies additional information as to why a 20 percent discount was chosen, including oversupply in the current market. "[A]n expert must apply his own knowledge and ideas in order to reach an opinion as to the market value of a project."[23] We conclude that the evidence was sufficient to show that Shulz's opinion was not based on "sheer

---

[21] See *Foster v. Tycor, Inc.*, 267 Ga. App. 767, 769-770 (601 SE2d 172) (2004).

[22] (Punctuation omitted.) *Nash*, 296 Ga. App. at 877 (b).

[23] *Marett Properties*, 204 Ga. App. at 267.

speculation." "As there is some evidence to support the trial court's order, it must be affirmed."[24]

## Case No. A09A2022

3. The TKW Defendants claim that the trial court erred in finding that the Property's "as-is" value, rather than a value based on its "highest and best use," was the true market value for purposes of OCGA § 44-14-161 (b). For the reasons set forth in Division 2 (b), supra, we disagree. The TKW Defendants also claim that the trial court erred in confirming the sale because it relied on an incorrect finding that both appraisers agreed on the same valuation. We find no merit in this argument. The two appraisers agreed on the value of the Property as a single unit, and we construe the trial court's finding that there was no variance between the experts as to the "true market value" of the Property to reflect that fact and not a misunderstanding as to the nature of the evidence. The trial court acknowledged "there is a dispute as to what the true value is" and then ruled that the highest and best use of the Property was not its proper value in this case. We find no error.

*Judgment affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED FEBRUARY 23, 2010.

*Cohen, Pollock, Merlin & Small, Gus H. Small, Jr., Brent W. Herrin,* for appellants (case no. A09A2022).

*Smith, Gambrell & Russell, Stephen M. Forte, John R. Autry, Jason S. Bell,* for appellants (case no. A09A2023).

*Anthony D. Lehman, Paul N. Monnin, Mark E. Grantham, James F. Cirincione,* for appellees.

---

[24] *Nash,* 296 Ga. App. at 877 (b).